FILED

2005 Aug-25  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CHARLOTTE ECKLUND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-02-S-2357-NE** |
| | ) | |
| **CONTINENTAL CASUALTY** | ) | |
| **COMPANY, a corporation, d/b/a** | ) | |
| **CNA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Charlotte Ecklund, a former employee of Computer Sciences Corporation ("CSC"),[1] filed this action under sections 1132(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff claims that she was wrongfully denied long-term disability benefits pursuant to her employer's group, long-term, disability insurance policy. The policy was underwritten by defendant, Continental Casualty Company, an entity that conducts business as CNA ("CNA" or "defendant"). The action now is before the

---

[1]From the parties' submissions, it is unclear whether plaintiff has been officially separated from her employment at CSC, or whether she still is employed with the company, but is on some type of extended disability leave status. However, it *is* clear that plaintiff is no longer actually going to work at CSC on a day-to-day basis. Thus, for the sake of convenience, the court will refer to plaintiff as a "former employee."

court on defendant's motion for summary judgment.[2]  Upon consideration of the

pleadings, evidentiary submissions, and briefs, the court concludes that the motion

should be granted.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment

"shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, "the plain language of Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and
> make all reasonable inferences in favor of the party opposing summary
> judgment.

> The mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is material to an issue
> affecting the outcome of the case.  The relevant rules of substantive law
> dictate the materiality of a disputed fact.  A genuine issue of material
> fact does not exist unless there is sufficient evidence favoring the

---

[2]Doc. no. 14.

nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## II.  SUMMARY OF FACTS

### A.    Plaintiff's Employment with CSC

Plaintiff first was employed by CSC on November 17, 1999, to work full-time

in a position described as "Administrative Assistant IV."[3]  CSC's job description

states that an Administrative Assistant IV "[p]erforms various high-level

administrative/technical duties for an individual or in support of a function.  Under

limited supervision, performs highly skilled administrative/technical duties requiring

initiative and independent judgment.   Work is complex.   Interfaces with

customers/vendors on a daily basis."[4] The "Job Characteristics" of an Administrative

Assistant IV are summarized by CSC as follows:

- •  Maintains statistics for and prepares special reports.
- •  Uses advanced knowledge of various computerized systems, word

---

[3]*See* defendant's evidentiary submission, Tab 2, at document bearing Bates stamp number CNA2-226.  ***Note:*** Both parties refer to the large quantity of documents relating to plaintiff's disability claim bound under Tab 2 of defendant's evidentiary submission by reference to the Bates stamp number impressed on each page, and so will this court.  **Accordingly, all subsequent references to "CNA2-###" are to the page number(s) of documents collected under Tab 2 of defendant's evidentiary submission** (appended to doc. no. 14).

[4]CNA2-221.

processing equipment and standard software packages in performing moderately complex tasks.  Generates technical and nontechnical documentation, reports, and/or data.

- • Coordinates special projects and activities.
- • Establishes department/unit administrative operating techniques.
- • Researches and responds to inquiries.
- • May train and provide work direction for others.
- • Performs other administrative/technical duties as assigned.[5]

## B.    The CSC Plan

As a full-time employee, plaintiff was afforded long-term disability insurance coverage under an employee welfare benefit plan ("the CSC plan" or "the plan") issued by CNA and governed by ERISA.[6]  The plan was fully insured, and CSC paid claims from its own assets.[7]  The CSC plan also afforded CNA discretionary authority to make decisions on claims such as plaintiff's: "When making a benefit determination under the policy, *We* have discretionary authority to determine *Your*

---

[5]*Id.*

[6]*See* defendant's evidentiary submission, at Tab 1 (CSC group policy).  The term "employee welfare benefit plan" is defined by ERISA as

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such a plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of . . . disability.

29 U.S.C. § 1002(1).  Plaintiff acknowledges her claims are covered by ERISA.  *See* doc. no. 20 (plaintiff's brief in opposition to defendant's motion for summary judgment), at 6 (stating that "any state law claims Plaintiff may have had were preempted by ERISA").

[7]*See* doc. no. 18 (plaintiff's evidentiary submission), Tab 1 (deposition of Jeffrey O'Polka), at 86.

-4-

eligibility for benefits and to interpret the terms and provisions of the policy."[8]  The

pertinent provisions of the CSC plan define a disability as follows:

> "*Disability"* means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1.    Continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2.    Not working for wages in any occupation for which *You* are or become qualified by education, training or experience.[9]

The plan further provides that a claimant must provide proof of disability in order to

receive benefits, as follows:

> **Proof of Disability**
>
> The following items, supplied at *Your* expense, must be a part of *Your*

---

[8]Defendant's evidentiary submission, Tab 1 (CSC group policy), at 6 (emphasis in original). The italicized terms are ones which are given a specific definition under the policy.  The term "*We*" is defined by the policy as "the Continental Casualty Company, Chicago, Illinois."  *Id.* at 17.  The term "*Your*" is defined as "the employee to whom this certificate is issued and whose insurance is in force under the terms of the policy."  *Id.*

[9]*Id.* at 8 (emphasis in original).  The policy further defines the term "Elimination Period" as follows: "The *Elimination Period* begins on the day *You* become *Disabled*.  It is a period of continuous *Disability* which must be satisfied before *You* are eligible to receive benefits from *Us*. You must be continuously *Disabled* through *Your Elimination Period*."  *Id.* at 9 (emphasis in original).
    The term "Injury" is defined as "bodily injury caused by an accident which results, directly and independently of all other causes, in *Disability* which begins while *Your* coverage is in force." *Id.* at 16 (emphasis in original).  "Sickness" is defined as "sickness or disease causing *Disability* which begins while *Your* coverage is in force."  *Id.* at 17 (emphasis in original).  The term "Material and Substantial Duties" is defined as "the necessary functions of *Your Regular Occupation* which cannot reasonably be omitted or altered."  *Id.* at 16 (emphasis in original).  The term "Regular Occupation" is defined as "the occupation that *You* are performing for income or wages on *Your Date of Disability*.  It is not limited to the specific position *You* held with *Your* employer."  *Id.* at 17 (emphasis in original).

proof of loss.  Failure to do so may delay, suspend or terminate *Your* benefits:

1. The date *Your Disability* began;
2. The cause of *Your Disability*;
3. The prognosis of *Your Disability*;
4. Proof that *You* are receiving *Appropriate and Regular Care* for *Your* condition from a *Doctor*, who is someone other than *You* or a member of your immediate family;
5. **Objective medical findings which support *Your Disability*. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s)**;
6. The extent of *Your Disability*, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*;
7. Appropriate documentation of *Your Monthly Earnings*.  If applicable, appropriate, regular monthly documentation of *Your Disability Earnings*;
8. If *You* were contributing to the premium cost, proof of *Your* appropriate payroll deductions;
9. The name and address of any *Hospital* or *Health Care Facility* where *You* have been treated for *Your Disability*;
10. If applicable, proof of incurred costs under other benefits included in the policy.[10]

## C.    Plaintiff's Initial Claim

Plaintiff ceased working for CSC on July 27, 2001, due to her claimed disability.[11]  CSC submitted an application for long-term disability benefits (the "claim form") on plaintiff's behalf on July 24, 2001.[12]  Dr. Scott Royster, plaintiff's

---

[10]*Id.* at 14 (italicized emphasis in original; boldface emphasis supplied).

[11]CNA2-226.

[12]*Id.*  Plaintiff signed her portion of the claim form on July 5, 2001.  Plaintiff's physician

primary care physician, indicated on the claim form that plaintiff became totally disabled on June 28, 2001, and that she was not expected to return to work.[13]  Dr. Royster stated plaintiff's "complete diagnosis" as fibromyalgia[14] and chronic fatigue syndrome, and he characterized plaintiff's condition as imposing a "full work restriction due to physical, emotional impairment."[15]

Plaintiff also submitted a Health Care Provider Certification, which was completed by Dr. Royster.  He stated that plaintiff was diagnosed with fibromyalgia in 1990, and that her condition would likely endure for the remainder of her life.[16] He indicated that plaintiff would require continual, "indefinite" treatment for her condition.[17]  Dr. Royster also attached a "To Whom It May Concern" letter, dated June 17, 2001, stating:

> Mrs. Ecklund has been under my primary medical care since May 10, 1993.  She was diagnosed with fibromyalgia a few years prior.  This is a chronic condition characterized by fatigue, multiple anatomic points of tenderness, and other clinical manifestations.  Her condition has

---

signed the form on July 17, 2001.  A CSC representative signed the form on July 23, 2001.  CNA received the form on July 24, 2001.  *Id.*

[13]CNA2-227.

[14] One online medical dictionary defines fibromyalgia as "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points."  MerckSource Medical Dictionary, powered by Dorland's Illustrated Medical Dictionary, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzuszSzcomm onzSzdorlandszSzdorlandzSzdmd_f_06zPzhtm.

[15]CNA2-227.

[16]CNA2-229.

[17]*Id.*

deteriorated to the point that she finds it difficult to stay in one position (sitting/standing) for more than 30 minutes at a time.  Therefore, she is unable to carry on most of her job duties, and her fatigue has accelerated to the point that she is having to nap during lunchtime.  She is also unable to perform most of the duties at home required of a housewife. She currently takes several medications for the disorder and has been seen by specialists as well.

Because of her worsening condition, I have recommended that she apply for disability.[18]

CSC submitted "Functional Demands Analysis" and "Physical Demands Analysis" forms in conjunction with plaintiff's claim on August 15, 2001.  On the Functional Demands Analysis form, a CSC representative stated that plaintiff's work schedule was eight hours per day, five days per week, at a work pace described as "self."[19]  The form indicated that plaintiff regularly would be required to perform the following tasks:

- Understand, remember and carry out short, simple instructions
- Understand, remember and carry out multiple, detailed instructions
- Perform detailed work procedures consistently with minimal or no guidelines
- Make decisions and judgments based on sensory data, known guidelines or standards of practice
- Coordinate and compile data relevant to work responsibilities
- Analyze and synthesize data relevant to work responsibilities
- Recognize and anticipate potential hazards and take appropriate precautions

[18]CNA2-230.

[19]CNA2-217.

- Attend to tasks or duties at busy work site with multiple distractions
- Work in coordination with or in proximity to other workers
- Sustain ordinary work routine and organize tasks without special supervision
- Perform work tasks that require precise attainment of set limits, tolerance or standards
- Sustain high degree of emotional control and consistency
- Produce understandable written communication
- Produce understandable verbal communication
- Work at a constant pace for extended periods or throughout work day
- Perform repetitive and routine tasks
- Perform varied tasks with frequent changes — based on set instructions
- Perform varied tasks with frequent changes — pace and/or order is worker determined
- Adjust to a set schedule of work days and/or shifts
- Interact with co-workers to produce a product or provide a service
- Recognize and respond appropriately to changes in a work situation
- Recognize and respond appropriately to situations involving expression of emotions, personal viewpoints or ideas
- Monitor own quality of performance and alter behaviors to correct mistakes or improve outcome
- Perform effectively under stressful conditions.[20]

On the Physical Demands Analysis form, a CSC representative indicated that plaintiff would be required to use a computer and a telephone. The form further indicated that plaintiff would be required to stand for a maximum of one-half hour at a time, walk for a maximum of one-half hour at a time, and sit for a maximum of two

---

[20]CNA2-217 and CNA2-218.

hours at a time, during a workday.  Plaintiff would be required to stand for a *total* of one hour, walk for a *total* of one hour, and sit for a *total* of six hours during a workday.  Plaintiff would be able to alternate sitting and standing as needed, and she would be required to carry light packages and mail approximately twice weekly for half an hour.[21]

### D.    CNA's Initial Evaluation of Plaintiff's Claim

#### 1.    Internal investigation

CNA initially assigned plaintiff's claim to Disability Specialist Jeffrey O'Polka and Nurse Case Manager Freda Anderson.[22]  When O'Polka interviewed plaintiff on July 27, 2001, she advised him that she had been diagnosed with fibromyalgia in 1990.[23]  She also stated that sitting at her desk for long periods of time was very difficult, that she was often extremely fatigued at work, and that her work had begun to suffer as a result.  She reported problems with her memory, and stated that she was unable to take all of her pain medications while she was working because they caused drowsiness.  She also reported that she did water aerobics twice per week, but that her personal activities were somewhat limited.  "She indicated that she stopped doing housework a long time ago.  Her husband has to do everything.  She tries to help out

---

[21]CNA2-219 and CNA2-220.

[22]CNA2-225.

[23]CNA2-224.

occasionally, but usually is so fatigued that she is unable to get anything accomplished."[24]  She reported doing some shopping and running some errands, but stated that, during the day, she usually naps, reads, watches television, and uses her home computer.  She experiences pain in her lower back, legs, elbow and shoulders. At the time of the interview, plaintiff was taking several medications, including antidepressants and painkillers.[25]

Plaintiff telephoned O'Polka on August 7, 2001.  According to O'Polka's notes from the conversation, plaintiff informed O'Polka that she had gone into work at CSC to assist the person who had taken over her job duties.  O'Polka informed plaintiff that doing so was not "wrong," but suggested that if plaintiff could perform those duties, perhaps she could return to work on a regular basis.  Plaintiff informed him that she would not be able to perform her former job duties on a regular basis.[26]

CNA representatives subsequently requested and received medical records from Dr. Royster, as well as from Dr. Shergy, plaintiff's rheumatologist.  Upon review of those records, a CNA Nurse Case Manager concluded that "[t]he medical documentation is insufficient to support a *physical* impairment."[27]  The Psychiatric

---

[24]CNA2-224.

[25]*Id.*

[26]CNA2-222.

[27]CNA2-121 (emphasis supplied).

-11-

Case Manager assigned to plaintiff's file concluded that the "[c]linical evidence provided does not support an impairment to functionality *from a mental/nervous condition* which would preclude [plaintiff] from performing her own occupation."[28]

### 2.    Peer review

CNA sent plaintiff's file to two independent physicians, Dr. Eugene Truchelut, M.D. and Dr. Scott Yarosh, M.D.,   for peer review on September 11, 2001.[29] According to O'Polka, CNA seeks the opinions of independent physicians if it still has questions about a claimant's disability status after the claimant's file has been reviewed by a claims specialist and a nurse employed by CNA.[30]  The independent peer review consultants offer an additional medical opinion on the claimant's file. Neither of the physicians consulted in this case conducted an independent physical examination of plaintiff; instead, they simply examined the records of plaintiff's treating physicians.

### a.    Dr. Truchelut

Dr. Truchelut reviewed plaintiff's medical records and submitted a statement regarding plaintiff's disability status from a *physical* perspective on September 23, 2001.

---

[28]*Id* (emphasis supplied).

[29]*See* CNA2-119.

[30]O'Polka Deposition, at 22-23.

First, Dr. Truchelut examined records from Dr. William Shergy, plaintiff's rheumatologist, which commenced on May 10, 2000.[31]  He summarized Dr. Shergy's notes as follows:

> [plaintiff] was complaining of chronic pain, but not arthralgias.[32]  The physical examination noted a depressed affect and trigger points, but otherwise was negative.  Psychiatric treatment was discussed and Vioxx was prescribed. . . .  Physical examinations [on return visits] were similar, and the impression was fibromyalgia.  She was referred to a fibromyalgia clinic.[33]

Dr. Shergy's records further reveal that plaintiff reported "hurting all over, every bone, every muscle, every joint is hurting."[34]  Plaintiff was "quite distressed and stressed" in May of 2000 due to her mother's recent death and a friend's poor health.[35]  In November of 2000, Dr. Shergy reported plaintiff was in "no acute distress," but she did become emotional when discussing her symptoms.[36]  Plaintiff initially was reluctant to see a psychiatrist, but she eventually agreed to do so.[37]

---

[31]*See* CNA2-148 (Report by Dr. Truchelut); CNA2-195 through CNA2-212 (Records from Dr. Shergy).  Plaintiff began to see Dr. Shergy in May of 1999, but Dr. Truchelut apparently did not review any of Dr. Shergy's records prior to May 10, 2000.  *See* CNA2-208 (letter dated May 12, 1999 from Dr. Shergy, acknowledging plaintiff's referral).  Upon review of Dr. Shergy's earlier notes, however, the court concludes the findings in those notes do not substantially differ from those expressed in the notes following May 10, 2000.

[32]One medical dictionary defines "arthralgias" as "pain in a joint."  *Dorland's Illustrated Medical Dictionary* 140 (28th ed. 1994).

[33]CNA2-148 (Report by Dr. Truchelut).

[34]CNA2-199 (Treatment notes dated November 8, 2000).

[35]CNA2-199 (Treatment notes dated May 10, 2000).

[36]CNA2-195 (Treatment notes dated November 8, 2000, continued).

[37]*See id.* (Treatment notes dated November 8, 2000, and March 7, 2001).

-13-

Plaintiff's physical examinations all were negative for lung problems, cardiac problems, abdominal problems, rash, edema, neurological problems, problems with joint movement, and bowel or bladder problems.  In his March 7, 2001 treatment notes, Dr. Shergy stated that plaintiff exhibited "full range of motion with stable degenerative disease."[38]

Dr. Truchelut also reviewed Dr. Royster's records, commencing on June 22, 2000.[39]  He summarized those records as follows:

> On the first visit [to Dr. Royster], the claimant stated that she couldn't work anymore, and was complaining of multiple symptoms including fatigue, poor concentration, and pain.  Multiple impressions include fibromyalgia, insomnia, migraine headaches, and degenerative disk disease in the lumbar area.  A number of medications were prescribed including Prozac, Vioxx, Neurontin, Zanaflex, and Prozac. [sic][40]  On 12/14/00, the claimant returned with complaints of right shoulder pain and sinus symptoms.  *A physical examination was negative except for a rash over the abdomen and back.  Examination of the right shoulder was unremarkable.*[41]  On 1/19/01, the claimant was treated for lower back pain.  Her medications were restructured.[42]  A note from 3/20/01 indicates that the claimant had been attending a water aerobics program for her fibromyalgia.  *The brief physical examination reported here described only tenderness in the lower paraspinal musculature.*[43]  Dr. Royster saw the claimant again on 5/11/01 for a

---

[38]*See id.* (Treatment notes dated March 7, 2001).

[39]*See* CNA2-148 and CNA2-149 (Report by Dr. Truchelut).  *See also* CNA2-180 through CNA2-194 (records from Dr. Royster).

[40]*See* CNA2-194.

[41]*See id.*

[42]*See* CNA2-192.

[43]*See id.*

-14-

flare of fibromyalgia symptoms.  *The examination describes only tenderness over the neck, shoulders, thighs, and upper back.*  The claimant's dosage of Prozac was increased and lorazepam was prescribed.[44]  On 5/31/01, the claimant returned stating that she wanted to apply for disability.  *No physical examination was described except for weight.*  Lortab was prescribed for shoulder pain.[45]  On 6/8/01, Dr. Royster treated the claimant for sinusitus.  *The physical examination was consistent with this.*  Antibiotics and expectorants were prescribed. On that date, a CBC and metabolic panel revealed only minor abnormalities.[46]

Dr. Truchelut then summarized the "To Whom It May Concern" letter Dr.

Royster dictated on June 17, 2001,[47] and further stated:

> [Dr. Royster] saw the claimant again on 6/28/01.  This was one day after her last date of work.  The claimant complained that her left shoulder was painful on occasion.  *Examination revealed tenderness over the subacromial area[48] and left epicondyle,[49] but range of motion was full.*  Lortab and Vioxx were prescribed for fibromyalgia, epicondylitis,[50] and tendinitis[51] over the left shoulder.  It is not clear

---

[44]*See* CNA2-191.

[45]*See id.*

[46]CNA2-148 and CNA2-149 (emphasis supplied); *see also* CNA2-189.

[47]*See* CNA2-187.  *See also* text accompanying footnote 18, *supra.*

[48]The term "subacromial" is defined as "situated below or beneath the acromion."  *Dorland's Illustrated Medical Dictionary* 1594 (28th ed. 1994).  The "acromion" is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder."  *Dorland's Illustrated Medical Dictionary* 20 (28th ed. 1994).

[49]The term "epicondyle" is defined as "an eminence upon a bone, above its condyle."  *Dorland's Illustrated Medical Dictionary* 564 (28th ed. 1994).  The court assumes Dr. Royster was referring to the bone in plaintiff's shoulder.

[50]"Epicondylitis" is defined as "inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus," or "tennis elbow."  *Dorland's Illustrated Medical Dictionary* 564 (28th ed. 1994).

[51]"Tendinitis" is defined as "inflammation of tendons and of tendon-muscle attachments."  *Dorland's Illustrated Medical Dictionary* 1666 (28th ed. 1994).

whether he also administered injections into the left shoulder, elbow, and trigger points.[52] A brief note from 7/17/01, [sic] lists the claimant's medications of Prozac, Soma, Topamax, Lortab, Viox, Ativan, and Premarin, but *gives no report of a physical examination except for weight*.[53] Dr. Royster filled out an FMLA form on that date, stating that the claimant had a chronic disability which was both physical and psychological due to the fibromyalgia. On 8/14/01, he discussed the topics of fibromyalgia and migraines (the latter were occurring 2/3 times per week and were improved with OTC medications such as Excedrin). Apparently the claimant had recently been evaluated for hemorrhoids and was scheduled for colonoscopy. She was complaining of pain in the lower thoracic spine. *The only physical examination recorded here describes tenderness in the lower thoracic spine in the midline.* OxyIR was prescribed.[54] The colonoscopy was performed on 8/16/01, by a Dr. Golzarian, with findings of sigmoid diverticulosis[55] and petechiae[56] in the rectum and cecum. Hemorrhoids were also present, and conservative treatment was advised.[57] A thoracic spine x-ray series on 8/22/01 was read as normal by the radiologist.[58] On 8/27/01, Dr. Royster sent a letter to [CNA], which summarized the claimant's previous medical care, stating that the claimant met all the criteria for the diagnosis of fibromyalgia, and that her symptoms had worsened to the point where he had suggested that she file for disability. He listed a multitude of the claimant's symptoms and comments that he did not expect a return to work, but also said "in order to be gainfully employed,

---

[52]*See* CNA2-189.

[53]*See* CNA2-186.

[54]*See* CNA2-185.

[55]The term "sigmoid" means "shaped like the letter S or the letter C." *Dorland's Illustrated Medical Dictionary* 1520 (28th ed. 1994). "Diverticulosis" is defined as "the presence of diverticula, particularly of colonic diverticula, in the absence of inflammation." *Id.* at 499-500. "Diverticula" is the plural term for "diverticulum," which is defined as "a circumscribed pouch or sac of variable size occurring normally or created by herniation of the lining mucous membrane through a defect in the muscular coat of a tubular organ." *Id.* at 500.

[56]"Petichiae" is the plural term for "petichia," which is defined as "a pinpoint, nonraised, perfectly round, purplish spot caused by intradermal or submucous hemmorhage." *Id.* at 1268.

[57]*See* CNA2-184.

[58]*See* CNA2-183.

-16-

she would need a job that would allow frequent breaks for position changes and the ability to lie down to rest when needed.  She would also require a position with minimal psychological stress."  The claimant's medications were also listed.[59]

The court finds Dr. Truchelut's summary of Dr. Royster's records to be complete and accurately based on the record, with one exception: *i.e.,* Dr. Truchelut did not mention several symptoms and limitations plaintiff described to Dr. Royster during her May 11, 2001 visit.  Dr. Royster noted that, due to her fibromyalgia, plaintiff reported:  having difficulty sitting for more than thirty minutes at once; being

---

[59]CNA2-148 and CNA2-149 (Report by Dr. Truchelut) (emphasis supplied). *See also* CNA2-181 and CNA2-182.  The letter states in full:

> Mrs. Ecklund has been under my primary medical care since 1993.  She was diagnosed with fibromyalgia and she meets all the criteria for that diagnosis set forth by the American Rheumatologic Association.  She has faithfully served her employer despite her condition throughout the years since her diagnosis.  However, her symptoms have worsened to the point that I suggested she file for disability.  Avoiding the physical and emotional stress of her job will allow her condition's progression to slow down and give her a more manageable life.  I do not expect her to return to work.

> Mrs. Ecklund's symptoms are chronic fatigue, nonrestorative sleep, morning stiffness, panic attacks, irritable bowel disorder, anxiety, mental confusion, poor endurance, dysesthesia, drowsiness, difficulty concentrating, dizziness, frequent headaches, daily muscular pain, and tenderness in multiple locations.  Weather changes, hormonal changes, overwork and stress exacerbate these symptoms.  She finds it difficult to remain in a sitting or standing position for greater than 15 minutes due to increase in her pain.  In order to be gainfully employed, she would need a job that would allow frequent breaks for position changes and the ability to lie down to rest when needed.  She would also require a position with minimal psychological stress.

CNA2-181.

-17-

tired all the time; having been unable to do housework for months; being unable to lift items at work; and having to nap during lunchtime at work.[60]

Dr. Truchelut also reviewed the report of Dr. William Confer, a clinical psychologist who previously had examined plaintiff.   "It was [Dr. Confer's] impression that [plaintiff] had significant depression, but he was unsure whether this was a symptom of the fibromyalgia or independent of it.   He also suggested an assessment for possible narcolepsy.   This was based on her reports of daytime drowsiness symptoms."[61]

Finally, Dr. Truchelut evaluated an "Activities of Daily Living" form completed by plaintiff and sent to CNA on August 31, 2001.[62]   On the form, plaintiff stated that her condition affects her interest and ability to care for her daily personal needs, and commented that she performs such personal tasks slowly.[63]   She stated that she cooks meals for herself approximately one or two times per week, that her husband helps her with the laundry, and that she does "very little" housecleaning such

---

[60]CNA2-191.

[61]CNA2-149 (Report by Dr. Truchelut).  *See also* CNA2-150 through CNA2-168 (Records of Dr. Confer).  Dr. Confer's findings will be discussed in more detail *infra,* insofar as they was evaluated by Dr. Yarosh.

[62]*See* CNA2-149.  *See also* CNA2-169 through CNA2-173.  The form does not indicate the date on which plaintiff actually completed it.

[63]CNA2-170.

as dusting, folding clothes, and "picking up."[64]  She shops for groceries with help

from her husband, and requires assistance with large items, or with a large number

of items.[65]  She also shops at clothing stores, and is able both to drive and to leave her

home without assistance.   She spends time away from home attending social

functions, shopping, and visiting family.  She watches television and listens to the

radio for four hours at night, and she reads daily, but sometimes experiences difficulty

due to blurriness in her eyes.  She uses the computer for email, and she regularly

communicates with other people over both the telephone and the internet.  She does

water aerobics for exercise approximately two hours per week.  She tries to sleep

approximately nine and one-half hours per night, but she usually does not sleep

through the night due to pain, restlessness, or urges to use the bathroom.[66]  She has

lost weight because her pain causes a decrease in her appetite, and she reports that her

condition has prevented her from exercising as often as she would like.[67]  She stated

that she enjoyed her job while she was working, and is interested in returning to work

when she is able.[68]

        Based on all of the data discussed above, Dr. Truchelut reached the following

---

[64]*Id.*

[65]*Id.*

[66]CNA20-171.

[67]CNA2-172.

[68]*Id.*

conclusion:

> I do not see any physical, radiological, laboratory, or endoscopic evidence which would support an inability to perform the claimant's job duties as described in the employer's PDA. This impression would be from the physical perspective only. I am not able to assess her mental status. I note that in her ADL survey, she reported engaging in a number of sedentary and light activities in her home life.[69]

Dr. Truchelut later contacted Dr. Royster by telephone, and submitted a supplemental statement on October 1, 2001, recounting his conversation with Dr. Royser as follows:

> Dr. Royster said that this was essentially a case of fibromyalgia, *without any specific physician findings, other than the muscular tenderness.* He last saw the claimant on 9/13/01, and at that time there were no changes in her physical examination. He said the claimant has had this diagnosis for years, during which time she worked, and now she states that she cannot work, so he is more inclined to find her subjective complaints credible. That is, when the claimant tells him that she cannot do her job, he takes this at face value as the truth, even if the physical examination findings are disproportionate. The way he understands it, the claimant's occupation has been emotionally demanding, and this is the main problem – it results in a worsening of her fatigue. The claimant has also been complaining recently of cognitive deficits, e.g., mental confusion, and this is being evaluated by the claimant's clinical psychologist, Dr. William Confer . . . with plans for a full sleep study and a neuropsych battery of testing. Dr. Royster hopes that this will provide more substantial evidence of a functional impairment, at least from the mental side.[70]

Dr. Truchelut did not alter his opinion about plaintiff's disability status after his

---

[69]CNA2-149.

[70]CNA2-147 (emphasis supplied).

telephone conversation with Dr. Royster.[71]

### b.    Dr. Yarosh

Dr. Yarosh reviewed plaintiff's file to determine whether "the medical information support[s] a continuous impairment to function based on claimant's psychiatric condition that would have existed from 6/27/01 to current."[72]   He reviewed the following medical records:  (1) the Functional Demands Analysis for plaintiff's position;[73] (2) a letter to Dr. Royster from Dr. Confer, dated August 31, 2001, describing plaintiff's initial psychological evaluation;[74] (3) a copy of the initial psychological evaluation report rendered by Dr. Confer on August 31, 2001;[75] (4) results of psychological testing performed by Dr. Confer;[76] (5) a summary of composite scores from plaintiff's psychological testing;[77] (6) the August 27, 2001 letter from Dr. Royster, stating that he did not expect plaintiff to return to work;[78] and, (7) rheumatologic notes indicating that plaintiff has chronic pain and fibromyalgia.[79]

---

[71]*See* CNA2-147.

[72]CNA2-138.  This was the precise issue presented to Dr. Yarosh by CNA.

[73]*See* CNA2-217 through CNA2-220.

[74]CNA2-164.

[75]CNA2-165 through CNA2-168.

[76]CNA2-152 through CNA2-155.

[77]CNA2-156 through CNA2-160.

[78]CNA2-181 through CNA2-182.

[79]The court assumes this is a reference to Dr. Shergy's notes, which can be found at CNA2-195 through CNA2-212, and were summarized *supra,* at pages 13-14.

It is apparent from his report that Dr. Yarosh conducted a complete and thorough review of these records.

Plaintiff first saw Dr. Confer in August of 2001, upon referral from Dr. Royster.[80] She complained of trouble remembering things at work and at home.[81] She also reported suffering panic attacks and problems sleeping, which she attributed to her fibromyalgia.[82] Dr. Confer concluded that plaintiff suffered from depression, which "may or may not be attributable to fibromyalgia."[83]

Dr. Confer administered the Wechsler Memory Scale - Third Revision test ("WMS-III") — a standardized test which evaluates memory performance — to assess plaintiff's reports of failing memory.[84] On the subtest used to estimate her intellectual potential, plaintiff performed at the seventy-fifth (75th) percentile, which is a better-than-average score.[85] However, plaintiff exhibited "uneven performance" on the memory aspects of the test.[86] Her ability to recall information presented visually exceeded her ability to recall information presented verbally, and her scores

---

[80]*See* CNA2-165.

[81]*Id.*

[82]*Id; see also* CNA2-166.

[83]CNA2-168.

[84]*See* CNA2-139 (report by Dr. Yarosh); *see also* CNA2-152 through CNA2-155 (results of WMS-III test administered by Dr. Confer).

[85]CNA2-152.

[86]CNA2-154.

on memory subtests ranged from the fifth (5th) percentile to the eighty-eighth (88th) percentile.[87]   Her memory scores were significantly lower when she was asked to recall information after a 25 to 30-minute delay.[88]   Dr. Confer noted that plaintiff's "information processing limitations" may have been "further compromised by considerable emotional reactivity to her performance limitations."[89]

Upon his review of these test results, Dr. Yarosh concluded that plaintiff's WMS-III scores were "reflective of someone with a mood disorder.  Difficulties with auditory memory and poor retention are typical findings in persons with dysthymia[90] and major depressive disorders.  It should be noted that administering one test is by no means definitive in assessing an individual's memory functioning."[91]   Dr. Yarosh then conducted a peer conference with Dr. Confer, who confirmed his prior findings that plaintiff exhibited symptoms of cognitive impairment likely due to fibromyalgia, including poor memory and sleep impairment.[92]

In summary, Dr. Yarosh stated the results of the WMS-III test did not support

---

[87]*See* CNA2-153 and CNA2-154.

[88]CNA2-153.

[89]*Id.*

[90]"Dysthymia" is defined as "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression."  *Dorland's Illustrated Medical Dictionary* 519 (28th ed. 1994).

[91]CNA2-139.

[92]*Id.*

plaintiff's claims of an inability to focus her attention and to concentrate. Considering that plaintiff's overall intellectual functioning is average to above average, he stated that she "ought to be able to carry off the duties of her job."[93]  He acknowledged that the WMS-III test demonstrated poor performance in some areas of memory, but suggested that the impairment could be attributable to a mood disorder such as depression.  He pointed out that Dr. Confer "does not see [plaintiff] as permanently and totally disabled and does not know what to make of her symptoms of selective cognitive dysfunction."[94]  He stated in conclusion:

> I believe that these findings [of cognitive dysfunction] are consistent with someone who has a psychiatric disorder such as major depression or anxiety and/or someone who is taking medications, which can dull certain aspects of cognitive function such as the memory problems described above.  Based upon the duties of her job, as I understand them, I believe that she is able to function as an Administrative Assistant by using ordinary memory compensation techniques such as a day planner or post-it notes.  *Her overall intellectual functioning and ability to demonstrate executive function is certainly adequate that she ought to be able to perform the duties of her job.*  There is evidence of some auditory memory problems, as measured by the WMS-III; *there is not sufficient evidence to suggest that she cannot carry out her responsibilities as an Administrative Assistant IV.*[95]

### 3.    Denial of claim

---

[93]CNA2-139.

[94]CNA2-140.  *See* footnote 145, *infra,* for a discussion of plaintiff's objection to this statement.

[95]*Id.* (emphasis supplied).

Based upon the medical information presented, including the independent peer review reports by Dr. Truchelut and Dr. Yarosh, CNA decided to deny plaintiff's benefits.  As the Nurse Case Manager noted in plaintiff's file on October 10, 2001,

> [Plaintiff] advises she is unable to work due to inability to focus & concentrate.  Testing performed does not reflect impairment in attention or concentration and demonstrates that [plaintiff's] verbal intelligence is average to above average.  Overall intellectual functioning & ability to demonstrate executive function is adequate to perform the duties of her job as Administrative Assistant IV.
>
> There is insufficient medical evidence to support a decrease in functionality which would preclude [plaintiff] from performing her job.[96]

O'Polka sent plaintiff a letter on October 17, 2001, explaining the reasons for the denial.  O'Polka summarized the medical records reviewed by CNA, and stated in summary:

> [Y]ou have complained of a variety of symptoms, many of which you have experienced for several years.  The physical examination findings and lack of or minimal positive test results from Dr. Royster do not indicate the existence of a significant physical impairment.  While you have exhibited some symptoms of anxiety and depression, those symptoms would not prevent you from performing your job duties.  In addition, your low test scores in memory performance are also not indicative of a cognitive impairment that would prevent you from performing your job.  Therefore, since the medical documentation provided to us does not support a physical or mental impairment that would have prevented you from performing the material and substantial duties of your occupation on a continuous basis from 6/28/01 to the

---

[96]CNA2-119.

-25-

present, we are unable to approve your claim for benefits.[97]

**E.    Reconsideration**

Plaintiff subsequently retained an attorney, who requested CNA to review the denial of benefits on November 26, 2001.[98]   On March 28, 2002, plaintiff submitted additional records to support her claim on reconsideration.[99]   Some of the information submitted on March 28 was duplicative of that already submitted.   The *new* medical information is summarized below.

First, plaintiff submitted records from Dr. Javad Golzarian, M.D., who performed a colonoscopy on August 16, 2001, to investigate the cause of plaintiff's reported problems with rectal bleeding.[100]   The results of the procedure were within normal limits.   Dr. Golzarian saw plaintiff again on October 24, 2001, due to reports of left abdominal and left flank pain.[101]   He concluded the pain was attributable to plaintiff's fibromyalgia, and recommended that plaintiff use warm baths and warm compresses to treat the pain.[102]

Plaintiff also submitted records from Dr. James McMurray, a urologist.   Dr.

---

[97]CNA2-134 and CNA2-135.

[98]*See* CNA2-129.

[99]*See* CNA2-128; CNA2-014 through CNA2-112.

[100]*See* CNA2-015 through CNA2-021.

[101]CNA2-015.

[102]*Id.*

McMurray reported that he saw plaintiff in October of 2001 for complaints of hematuria,[103] recurrent left flank pain, and dry coitus.  The physical examination and all tests performed were within normal limits.[104]

Finally, plaintiff submitted the results of a sleep study performed by Dr. Confer on October 14 and 15, 2001.[105]  The study indicated that plaintiff slept 5.8 hours out of 7.2 hours in bed, and that she fell asleep during three out of four opportunities to take a nap during the day.[106]  Plaintiff's respiratory activity, snoring, cardiac activity, and limb movements were normal.[107]  Dr. Confer concluded that plaintiff did not suffer from narcolepsy, and indicated that "her daytime weariness is much more likely to be attributable to fibromyalgia and/or depression than a biologically based sleep disorder."[108]  He recommended that she continue taking antidepressant medication.[109]

CNA reviewed the additional information submitted by plaintiff, and on April 1, 2001, it decided to deny plaintiff's request for reconsideration.[110]  In the denial letter, CNA stated, "the additional medical documents submitted on appeal do not

---

[103]"Hematuria" is defined as "blood in the urine."  *Dorland's Illustrated Medical Dictionary* 743 (28th ed. 1994).

[104]CNA2-023.

[105]*See* CNA2-028 through CNA2-038.

[106]CNA2-031 and CNA2-032.

[107]CNA2-030.

[108]*Id.*

[109]*Id.*

[110]*See* CNA2-012 & CNA2-013.

offer any new information to support a continuous functional impairment, and does [sic] not change our opinion with regard to our previous disability determination."[111] CNA then forwarded plaintiff's claim for a formal appellate review.[112]

## F.    Appeal

On May 2, 2002, plaintiff submitted yet another set of records from Dr. Royster.  First, she submitted a Physical Capacities Evaluation dated April 30, 2002. On that form, Dr. Royster indicated that plaintiff was limited to less than one hour of sitting, standing, and walking in any given day.  He stated that she could only *occasionally* lift or carry objects weighing up to five pounds, and that she could *never* lift or carry heavier objects.  He stated that plaintiff could *occasionally* bend, squat, or reach at work, but that she could *never* crawl or climb.[113]

With regard to plaintiff's pain, Dr. Royster indicated that "[p]ain is present and found to be irretractably and virtually incapacitating to this individual."[114]  He stated that physical activity such as walking, standing, sitting, bending, stooping, or moving of extremities would increase plaintiff's pain "to such an extent that bedrest and/or medication is necessary."[115]  Due to plaintiff's pain and/or the medication prescribed

---

[111]CNA2-013.

[112]*Id.*

[113]CNA2-007.

[114]CNA2-008.

[115]*Id.*

-28-

for it, Dr. Royster opined that she "will be totally restricted and thus unable to function at a productive level of work."[116]  He also indicated that treatments such as nerve stimulation or injections "have had no appreciable effect or have only briefly altered the level of pain [plaintiff] experiences."[117]  He commented that plaintiff is not able to work because she "would most likely be absent in excess of 25 days per year due to her chronic illness."[118]

Dr. Royster also submitted a statement of plaintiff's symptoms, which he summarized as follows:

> Severe, persistent, chronic spasms, weakness, pain and muscle tenderness on repeated examinations; severe pain and tenderness in over 11 of the 18 tender points per ACR guides;[119] overall body aches; sciatica, disordered sleep, unrelenting fatigue, IBS, restless legs, migraines, anxiety, depression as well as cognitive disfunction (memory problems, difficulty concentrating or focusing, word finding problems, difficulty making decisions and integrating information, poor judgment, difficulty thinking clearly), to name some problems.[120]

CNA did not conduct an independent physical evaluation of plaintiff on appeal, and it did not send her records to another independent physician for peer review. Instead, Registered Nurse Doris Gloss, a member of CNA's Appeals Committee,

---

[116]CNA2-009.

[117]*Id.*

[118]*Id.*

[119]"ACR" is an acronym for the American College of Rheumatology.

[120]CNA2-010.

reviewed all of the record medical evidence and issued a letter to plaintiff's attorney on May 17, 2002, denying plaintiff's appeal.  In that letter, Gloss stated that CNA agreed with the form and content of the initial denial letter of October 17, 2001.[121] She also stated, "[a]lthough your client was diagnosed with fibromyalgia, a diagnosis does not confirm the inability to perform one's occupation, nor does it prove a disability."[122]  She then summarized the medical records in plaintiff's file, including the independent peer review reports, and stated in conclusion:

> [w]e reviewed the physical capacity evaluation submitted by Dr. Royster revealing your client is unable to sit, stand or walk for any length of time in an eight hour period, however, the information your client reported being able to do is disproportionate with this information.
>
> Although you some of your [sic] client's test results showed some abnormalities, she was able to continue to function in every day activities that were of sedentary to light duty.  She reported being able to perform most of her household activities, exercises, driving, and grocery shopping.  We relied on the expertise of an independent medical physician and the psychiatric/neurological consultant that concluded that although your client may present with various symptoms, they would not preclude her from functioning in her low activity level occupation as an Administrative Assistant.
>
> The decision made by CNA was correct and is being upheld.  We are sorry that our ruling could not be more favorable, however, we must abide by the medical evidence and the policy provisions.  You have exhausted all your administrative remedies offered by the appeals process and our claim remains closed.  This decision is final and

---

[121]CNA2-002.

[122]*Id.*

binding.[123]

This suit followed.

## III. DISCUSSION

Plaintiff presents two, primary arguments to support her claims in this case. First, she argues that CNA erred in denying her disability benefits. Second, she argues that CNA failed to conduct a "full and fair review" of her benefits claim.

### A. Denial of Benefits

As a threshold matter, the court must determine the appropriate standard for reviewing CNA's denial of plaintiff's claim for benefits, because ERISA does not specify the standard applicable to the decisions of a plan administrator or fiduciary. *See Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302, 1305 (M.D. Fla. 2002) (citing, *e.g.*, *Marecek v. BellSouth Telecommunications*, 49 F.3d 702, 705 (11th Cir. 1995) (other citation omitted)).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated three standards

---

[123]CNA2-003 & CNA2-004.

of review applicable to the decisions of a claim administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests." *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997).[124] Here, the plan grants the claims administrator the discretion to construe the terms of the plan. Further, because CNA both serves as claim administrator and pays claims from its own funds, it has a conflict of interests. CNA accordingly "concedes that . . . its decision to terminate long-term disability benefits will be judged under the 'heightened' arbitrary and capricious standard."[125]

Under the heightened arbitrary and capricious standard, the court must first determine on *de novo* review whether CNA's decision to deny plaintiff further long-term disability benefits was "wrong." *See HCA Health Services of Georgia v. Employers Health Insurance Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001) ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when,

---

[124]These standards apply not only to an administrator's interpretation of a plan term, but also to factual decisions of administrator, such as the decision in this case to deny plaintiff's benefits. *See Shaw v. Connecticut General Life Insurance Co.,* 353 F.3d 1276, 1284-85 (11th Cir. 2003).

[125]Doc. no. 15 (CNA's brief in support of summary judgment), at 15-16. Plaintiff agrees that the heightened arbitrary and capricious standard should apply, although she does assert that the degree of deference given to CNA's decision in this case should be slight. Doc. no. 20 (plaintiff's brief), at 6-8.

after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claim administrator's plan interpretation."). The court moves to the next step in its inquiry, to examine CNA's conflict of interests, only if CNA's decision is first deemed to be "wrong." *See, e.g., Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566 n.12 (11th Cir. 1990) ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.") (emphasis supplied); *Morency v. Rudnick & Wolfe Staff Group Long Term Disability Insurance Plan,* No. 899CV2688T24MAP, 2001 WL 737531, at *3 (M.D. Fla. Jan. 31, 2001) ("Applying the heightened arbitrary and capricious standard, the plaintiff must first establish that the decision made by the ERISA administrator was 'wrong.'") (quoting *Brown*, 898 F.3d at 1566-67 n.12). Simply put, if the court finds that CNA's decision to deny plaintiff long-term disability benefits was not "wrong," the inquiry is at an end, and summary judgment is due to be granted in CNA's favor.

Plaintiff claims that four items of evidence support her argument that CNA wrongfully denied her benefits: *i.e.,* (1) her diagnosis of fibromyalgia; (2) the opinion of Dr. Royster, her treating physician, that she is disabled; (3) the limitations on her daily personal activities; and (4) the findings of Dr. Confer, her treating psychologist. The court will discuss each in turn.

### 1.    Fibromyalgia diagnosis

Plaintiff places much emphasis on the fact that she has been diagnosed with fibromyalgia. Although this diagnosis apparently is undisputed, it is not sufficient, standing alone, to establish plaintiff's entitlement to disability benefits.[126] The issue is not whether plaintiff suffers from any certain condition; instead, the court must determine whether plaintiff satisfied the definition of "disability" under the CSC plan. In other words, the court must determine whether plaintiff's fibromyalgia caused "physical or mental impairment to such a degree of severity" that she is "continuously unable to perform" the duties of her job. *See Stenner-Muzyka v. Unum Life Insurance Co. of America,* No. 804CV984T17TBM, 2005 WL 1610708, at *5-*6 (M.D. Fla. July 7, 2005) (acknowledging the plaintiff's fibromyalgia diagnosis, but still upholding denial of benefits when the evidence presented did not satisfy a finding of total disability under the applicable policy).

### 2.    Dr. Royster's opinion

Plaintiff also claims that Dr. Royster's opinion and medical records establish her disability. The court disagrees. It is true that Dr. Royster has expressed his doubt over plaintiff's ability to work on several occasions, albeit with varying levels of

---

[126]The fact that plaintiff continued to work full-time for several years after being diagnosed with fibromyalgia further supports the proposition that a diagnosis alone is insufficient to establish a disability.

certainty.  On plaintiff's claim form, Dr. Royster indicated that plaintiff was not "expected" to return to work.[127]  On June 17, 2001, Dr. Royster stated in a letter that plaintiff "is unable to carry on *most* of her job duties."[128]  In an August 27, 2001 letter, Dr. Royster stated, "I do not *expect* [plaintiff] to return to work."[129]  He also said that, "[i]n order to be gainfully employed, [plaintiff] would need a job that would allow frequent breaks for position changes and the ability to lie down to rest when needed.  She would also require a position with minimal psychological stress."[130]  Dr. Royster did not conclusively proclaim plaintiff's inability to work until April 30, 2002, when he stated on plaintiff's Physical Capacities Evaluation form that, due to plaintiff's pain and medication, she "will be totally restricted and thus unable to function at a productive level of work."[131]  He also opined that plaintiff was unable to work because she "would most likely be absent in excess of 25 days per year due to her chronic illness."[132]  Plaintiff asserts that CNA was "wrong" in rejecting these opinions in favor of Dr. Truchelut's opinion that plaintiff is not disabled.

Initially, the court notes that Dr. Royster's opinion is not entitled to any special

---

[127]CNA2-227.

[128]CNA2-230 (emphasis supplied).

[129]CNA2-181 (emphasis supplied).

[130]*Id.*

[131]CNA2-009.

[132]*Id.*

weight simply because he is plaintiff's treating physician.  As the Supreme Court held in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003), courts in ERISA cases "have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.[133] *See also Richards v. Hartford Life and Accident Insurance Co.,* 356 F. Supp. 2d 1278, 1286 (S.D. Fla. 2004) (holding that it was not "wrong" for the administrator "to rely on the findings of an independent reviewing physician") (citations omitted). Even so, "[p]lan administrators . . . may not *arbitrarily* refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Nord,* 538 U.S. at 834 (emphasis supplied).

---

[133]The Court explained its reasoning as follows:

> As compared to consultants retained by a plan, it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual. Nor do we question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements. But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks.  And if a consultant engaged by a plan may have an incentive to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled."

*Nord,* 538 U.S. at 832 (internal quotation marks and citations omitted).

Here, CNA did not arbitrarily reject Dr. Royster's opinions.  To the contrary, CNA had ample reason to credit Dr. Truchelut's opinion over that of Dr. Royster. The CNA Plan requires a claimant to submit "objective medical findings" to support her claim of disability.  These "objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [the claimant's] disabling condition."[134]  Plan documents caution that failure to present such findings "may delay, suspend or terminate" a claimant's benefits.[135]

Dr. Royster's opinions were not based on "objective medical findings," as required under the CSC plan.  Instead, his opinions seem to be based almost entirely on plaintiff's subjective description of her symptoms and limitations.  Plaintiff reported multiple symptoms to Dr. Royster on several occasions, including pain, fatigue, insomnia, stiffness, anxiety, poor concentration, headaches, confusion, and depression.  However, there are no objective findings to support the conclusion that these symptoms are preventing plaintiff from performing altogether the duties of her job.  Dr. Royster did not conduct any tests on plaintiff, and the results of his clinical examinations are not sufficiently conclusive to support a finding of total disability.

---

[134]Defendant's evidentiary submission, Tab 1 (CSC group policy), at 14.

[135]*Id.*

Indeed, the notes from plaintiff's physical examinations reveal the following: On October 14, 2000, Dr. Royster reported that plaintiff's physical examination was "negative," and noted that his examination of her right shoulder was "unremarkable."[136]   On March 20, 2001, Dr. Royster reported "tenderness" in plaintiff's lower paraspinal musculature.[137]   In May 11, 2001, Dr. Royster's examination revealed "tenderness" in plaintiff's neck, shoulders, thighs, and upper back.[138]   Plaintiff saw Dr. Royster again on June 28, 2001, due to occasional pain in her left shoulder.  Although Dr. Royster's examination revealed some "tenderness" in the shoulder area, he noted that the range of motion was full.[139]   A further examination on August 14, 2001 revealed some tenderness in the spinal area.[140]   Plaintiff was referred to a radiologist, who concluded that x-rays performed on her spine were normal.[141]   The other physical examinations performed by Dr. Royster either were inconclusive, or revealed only problems other than those on which plaintiff bases her claim for benefits.[142]   Further, Dr. Royster described what he believed to be plaintiff's functional limitations in the workplace, but his conclusions

---

[136]CNA2-192.

[137]*Id.*

[138]CNA2-191.

[139]CNA2-189.

[140]CNA2-185.

[141]*See* CNA2-184.

[142]For example, plaintiff was treated for sinusitus and hemorrhoids.

appear to be based on plaintiff's subjective complaints.  There is no indication that he performed any tests to objectively determine plaintiff's limitations.

These physical findings reveal only that plaintiff suffers from some muscular tenderness in various parts of her body.  This evidence may be sufficient to support plaintiff's fibromyalgia diagnosis, but muscular tenderness alone would not render plaintiff "continuously unable to perform" the duties of her job.

Plaintiff asserts she should be exempted from the requirement of producing "objective medical evidence" of disability, because her condition is not readily susceptible to objective identification or documentation.  The court recognizes that a fibromyalgia sufferer will not always be able to present objective evidence to support all of her symptoms, and that resulting difficulties may sometimes arise in the pursuit of disability benefits.   Nonetheless, plaintiff has presented no authority that would allow the court to disregard a plan term requiring objective medical evidence whenever a claimant suffers from a condition which does not readily lend itself to objective identification.  The court's task is to determine whether it was "wrong" for CNA to determine that plaintiff is not disabled *under the plan*.  It is not for the court to determine whether the plan is fair to plaintiff as written, or to rewrite a plan term if it creates an obstacle for plaintiff in marshaling evidence to support her claim.[143]

---

[143]The court is mindful of non-binding case law supporting the proposition that the administrator of a plan *which does not explicitly require objective medical evidence as proof of loss*

As there were no objective medical findings to support Dr. Royster's opinion that plaintiff is disabled, it was not "wrong" for CNA to reject his opinion and rely instead on Dr. Truchelut's opinion.

### 3.    Personal activities

Plaintiff also asserts that her limited personal activities should have been sufficient to establish her disability.  Again, the court disagrees.

Plaintiff reported cooking, doing laundry, performing housecleaning tasks, shopping for groceries and clothing, driving, socializing, watching television, listening to the radio, reading, using the computer, and doing water aerobics.  Her ability to perform household tasks and errands *is* limited, although she does not state exactly how often she performs some of these tasks.  Further, she requires her husband's assistance in carrying out some activities.

---

*to support a disability claim* should not require such evidence from a claimant who suffers from a condition, such as fibromyalgia or chronic fatigue, which is comprised primarily of a patient's subjective symptoms.  *See, e.g., Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 442-43 (3rd Cir. 1997) (holding that it was error for a plan administrator to require the claimant to submit clinical findings to support his diagnosis of chronic fatigue syndrome, when the plan did not require such evidence); *Mason v. Hartford Life and Accident Insurance Co.,* No. 02-10067-CIV, 2004 WL 2674352, at *4 (S.D. Fla. August 31, 2004) (holding that it was wrong for an administrator to require a claimant suffering from fibromyalgia and chronic fatigue syndrome to submit objective medical evidence in support of her claim for benefits, when the plan did not require such evidence).

However, plaintiff has cited no authority, and the court has found none, to prohibit an administrator from requiring objective medical evidence *when the plan states such evidence will be required.*  Indeed, other district courts within this circuit have held that, when a plan requires objective medical evidence, the administrator can rely on a lack of such evidence to support a finding of no disability, even when the claimant suffers from a condition such as fibromyalgia.  *See, e.g., Stenner-Muzyka,* 2005 WL 1610708, at *5-*6 (disability determination could not be based on a claimant's "self-reported symptoms").

Plaintiff's reported limitations would not render her physically incapable of performing her job duties.  According to plaintiff's employer, her job would require her to stand for no more than one-half hour at a time, walk for no more than one-half hour at a time, and sit for no more than two hours at a time.  She would only be required to stand for a *total* of one hour and walk for a *total* of one hour during an eight-hour work day.  She would be able to sit for the remaining six hours, and would be required to carry mail and light packages twice per week for approximately half an hour.

These requirements are not inconsistent with plaintiff's reported personal activities.  Grocery or clothing shopping would likely require plaintiff to stand or walk for at least one-half hour at a time, even if she did receive help from her husband.  Most meals take at least a half-hour to prepare, and many household cleaning tasks take at least a half-hour to complete.  Lifting light grocery items would be as strenuous as carrying mail and light packages.[144]  Performing water aerobics would involve a higher level of physical activity than plaintiff's employer indicates she ever would have to exert at work.  When plaintiff is not carrying out the personal activities listed above, she does sedentary activities such as reading, watching television, listening to the radio, or using the computer.  Her ability to do sedentary

---

[144]Plaintiff indicated that she required her husband's help only in lifting *heavy* grocery items.

activities during most of the day is not inconsistent with an ability to sit for six hours in one day at work.

Plaintiff asserts that she would enjoy the ability to pace herself at home more than she would at work. This is no doubt true. Plaintiff would be in *complete* control of her activity level at home, but she would not be in the workplace. Even so, the record indicates that plaintiff would be given sufficient control over her activity level at work to accommodate her limitations. Her employer states that her activity level at work is self-paced, and that she would be able to alternate sitting and standing at work *as needed*.

Further, and perhaps more importantly, there are no "objective medical findings" to support plaintiff's claimed activity limitations. Accordingly, the court concludes it was not "wrong" for CNA to determine plaintiff is not disabled, even in light of the reported limitations on her personal activities.

### 4.   Dr. Confer's findings

Finally, plaintiff asserts that, in light of Dr. Confer's findings, it was "wrong" for CNA to rely on Dr. Yarosh's opinion that she is not disabled from a psychological perspective. Initially, the court notes that Dr. Yarosh did not *discredit* or *disagree with* Dr. Confer's findings. He simply analyzed Dr. Confer's records (along with other evidence) and gave his opinion based on the analysis. Further, the court notes

-42-

that, in his records, Dr. Confer never directly stated an opinion as to whether plaintiff is disabled.[145]

Plaintiff focuses her argument on the results of the WMS-III test Dr. Confer performed.  As plaintiff points out, her test results do reflect some significant memory deficiencies.  Indeed, her scores on some of the memory subtests reflected abilities equal to or greater than only approximately five percent (5%) of the population.  Plaintiff fails to point out, however, that many of her other memory subtest scores were within the "average" range or higher,[146] and that her intellectual potential was found to be equal to or greater than that of seventy-five percent (75%) of the general population.  Further, the court is mindful that plaintiff did not *only* complain of memory deficiencies to support her claim of disability from a psychological perspective.  She also reported suffering problems with concentration and confusion,

---

[145]Dr. Yarosh's report contains the following statement: "Dr. Confer does not see [plaintiff] as permanently and totally disabled and does not know what to make of her symptoms of selective cognitive dysfunction." CNA2-140.  Plaintiff "strenuously objects" to this statement as inadmissible hearsay.  The court need not address plaintiff's objection, however, because even without considering the alleged hearsay, there is no evidence in the record to show that Dr. Confer considered plaintiff to be disabled.  Dr. Confer never directly gave an opinion about plaintiff's disability status, one way or another. *See Horton v. Reliance Standard Life Insurance Co.,* 141 F.3d 1038, 1040 (11th Cir. 1998) (holding that a plaintiff in an ERISA denial of benefits case "bears the burden of proving [her] entitlement to contractual benefits").

[146]For example, her "immediate memory" score was at the 39th percentile; her "immediate visual memory" score was at the 73rd percentile; her "visual delayed memory" score was at the 58th percentile; and her composite score for "retrieval" was at the 88th percentile. *See* CNA2-153 & CNA2-154.

and there are no test results in the record to support these symptoms.[147]

Dr. Yarosh examined all of Dr. Confer's records, as well as the other relevant evidence, and concluded that plaintiff's *overall* intellectual level of functioning would not prevent her from carrying out the duties of her job.[148]  Dr. Yarosh acknowledged that plaintiff did suffer from some memory deficiencies, but concluded that, in light of her higher level of *overall* cognitive functioning, she should be able to compensate for the memory problems.  The court finds no medical evidence in the record which is inconsistent with this conclusion.

In summary, all but one of the medical professionals who evaluated plaintiff or her medical records either determined plaintiff *not* to be disabled, or did not render an opinion about her disability.  Dr. Royster, the only medical professional who concluded that plaintiff is disabled, did not base his opinion on objective medical evidence, as required by the plan.  The court finds there is insufficient objective medical evidence in the record to establish that plaintiff's condition renders her continuously unable to perform the material and substantial duties of her regular

---

[147]*See* CNA2-165.

[148]Plaintiff asserts that Dr. Yarosh was poorly situated to render an opinion about whether plaintiff was capable of doing her job, because he possessed "limited knowledge of the requirements of [p]laintiff's job."  *See* doc. no. 20 (plaintiff's brief in opposition to defendant's motion for summary judgment), at 18-19.  The court concludes there is no basis for this assertion, because Dr. Yarosh states he reviewed the Functional Demands Analysis submitted by plaintiff's employer.  *See* CNA2-138.

-44-

occupation.   Accordingly, the court cannot conclude that CNA was "wrong" in determining that plaintiff is not disabled under the plan, and denying her long-term disability benefits.

## B.   Failure to Conduct a Full and Fair Review

Plaintiff also asserts that CNA failed to conduct a full and full review of her claim after its initial denial.  Any employee benefit plan governed by ERISA must:

> (1)  provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2)  afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  The U.S. Department of Labor has adopted regulations to elucidate the concept of a "full and fair review."  Those regulations provide, in pertinent part, that an administrator must "provide a claimant with written or electronic notification of any adverse benefit determination."  29 C.F.R. § 2560.503-1(g)(1) (2001).  The notification must:

> set forth, in a manner calculated to be understood by the claimant –

> > (i)  The specific reason or reasons for the adverse determination;

> > (ii)  Reference to the specific plan provisions on which the determination is based;

-45-

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and]

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. § 2560.503-1(g)(1)(i)-(iv) (2001).[149]

On an appeal from a denial of benefits, the administrator must:

(ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to the claimant's claim for benefits . . .;

(iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(ii)-(iv) (2001).

The regulations also set forth requirements which apply solely to disability plans, such as the one at issue here. Those plans must:

(ii) Provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the

---

[149]Similar notice requirements are in place for an administrator's determination on appellate review. *See* 29 C.F.R. § 2560.503-1(j) (2001).

adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual;

(iii) Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment;

(iv) Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination; [and]

(v) Provide that the health care professional for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual[.]

29 C.F.R. § 2560.503-1(h)(3)(ii)-(v) (2001).[150]

Plaintiff asserts that CNA violated these requirements because: (1) "CNA's denial letter insufficiently apprised her of the reasons for her denial, and thereby prevented her from perfecting her appeal";[151] (2) CNA did not identify what evidence she *could* have submitted to satisfy the plan definition of disability; and (3) CNA did

---

[150]These provisions are made applicable to disability plans by 29 C.F.R. § 2560.503-1(h)(4).

[151]Doc. no. 20 (plaintiff's brief in opposition to defendant's motion for summary judgment), at 22.

not "fully investigate [her] claim and honestly interpret the evidence."[152]

Upon review of CNA's October 17, 2001 denial letter to plaintiff, the court concludes it satisfies all the regulatory requirements.  First, the letter quotes the definition of a "disability" under the plan and describes why plaintiff does not satisfy that definition.  *See* 29 C.F.R. § 2560.503-1(g)(1)(ii) (requiring that the notification refer "to the specific plan provisions on which the determination is based").  Further, the letter identifies the "specific reason or reasons for the determination."  *See* 29 C.F.R. § 2560.503-1(g)(1)(i).  The letter states that plaintiff's claimed disability was "not supported by the treatment records received subsequent to [her] last day worked."[153]  It further states:

> The physical examination findings and lack of or minimal positive test results from Dr. Royster do not indicate the existence of a significant physical impairment.  While you have exhibited some symptoms of anxiety and depression, those symptoms would not prevent you from performing your job duties.  In addition, your low test scores in memory performance are also not indicative of a cognitive impairment that would prevent you from performing your job.  Therefore, *since the medical documentation provided to us does not support a physical or mental impairment that would have prevented you from performing the material and substantial duties of your occupation on a continuous basis from 6/28/01 to the present, we are unable to approve your claim for benefits.*[154]

---

[152]*Id.* at 24.

[153]CNA2-135.

[154]*Id.* (emphasis supplied).

-48-

These statements make it clear that CNA denied plaintiff's claim for benefits due to a lack of objective medical evidence.

The letter also makes it clear what additional information would be necessary for plaintiff to perfect her claim. *See* 29 C.F.R. § 2560.503-1(g)(1)(iii). Plaintiff's claim was denied due to a lack of objective medical documentation to support a disability that was sufficiently severe to render her unable to perform her job duties. To convince CNA to change its mind, plaintiff would need to present objective documentation from a medical source. It is true that CNA did not spell out in intricate detail the specific items of medical evidence which would be required for her claim to be approved. Nonetheless, the letter is more than sufficient to place plaintiff on notice of what evidence would be needed.[155]

Plaintiff also argues that CNA "did nothing" in connection with plaintiff's request for review.[156] In particular, she asserts that CNA did not properly consider the additional records from Dr. Royster that she submitted during her appeal, and that those records were not sent to an independent medical consultant or vocational expert

---

[155]Plaintiff does not assert that CNA failed to satisfy the requirement, set forth in 29 C.F.R. § 2560.503-1(g)(1)(iv), that it must provide "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review." Indeed, the court concludes that the denial letter clearly satisfies these requirements.

[156]Doc. no. 20 (plaintiff's brief in opposition to defendant's motion for summary judgment), at 24.

for review.

Plaintiff's assertion that CNA "did nothing" in connection with her request for review clearly is without merit. CNA granted plaintiff's request for review, considered the additional information she submitted, and sent her a letter stating that the new information did not alter its prior decision to deny benefits. CNA then forwarded plaintiff's file to its Appeals Committee, which reviewed the claim and issued a letter to plaintiff stating it would uphold its prior decision.

Further, it is apparent that CNA *did* consider the additional medical records from Dr. Royster, along with all the other medical information plaintiff submitted on appeal. Both the April 4, 2002 letter denying plaintiff's claim upon reconsideration, and the May 17, 2002 letter from the Appeals Committee finally denying plaintiff's claim on appeal, summarize the additional medical records plaintiff presented and state those records were considered in rendering the decision. CNA stated, and the court agrees, that these records did not contain any "new information" which would justify altering CNA's denial decision. The fact that plaintiff does not agree with CNA's decision is not sufficient to establish that CNA failed to conduct a full and fair review. To the contrary, the court finds that CNA conducted "a review that [took] into account *all* comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was

submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv) (emphasis supplied).

Finally, CNA's failure to send the new records from Dr. Royster to an independent physician or vocational expert is not dispositive of the "full and fair review" determination. Plaintiff has pointed to no plan provision, and the court has found none, that would require CNA to consult with an independent physician or vocational expert on appeal. The "full and fair review" regulations governing claims which involve a medical opinion require only that CNA consult with a "health care professional" who was not consulted in connection with the original denial of benefits. *See* 29 C.F.R. § 2560.503-1(h)(3)(iii) & (v).[157]  CNA complied with these regulations by having plaintiff's appeal evaluated by Doris Gloss, a registered nurse and member of the Appeals Committee who was not involved in the initial denial of plaintiff's benefits. *See Bjork v. Eastman Kodak Co.,* 189 F. Supp. 2d 3, 11 (W.D. N.Y. 2001) (administrator conducted a full and fair review when she "considered all evidence which was reasonably available to her," and was not required to investigate further when the relevant facts already were "amply supplied in the record").

In summary, the court finds that CNA conducted a "full and fair review" of

---

[157]29 C.F.R. § 2560.503-1(h)(3)(iv) only requires an administrator to *identify* any medical or vocational expert whose advice was obtained in connection with the claim.  That section does not require an administrator to *use* an expert to evaluate every appeal.

plaintiff's claim, in accordance with applicable federal regulations.   Summary judgment on those grounds is due to be denied.

## IV.  CONCLUSION

Based on all of the foregoing, defendant's motion for summary judgment is due to be granted, and all claims of plaintiff will be dismissed with prejudice.   An appropriate order will be entered contemporaneously herewith.

DONE this 25th day of August, 2005.

_____
United States District Judge